568 P.2d 1098

DUVAL SIERRITA CORPORATION, a Delaware Corporation, Appellant and Cross-Appellee,

v.

ARIZONA DEPARTMENT OF REVENUE, statutory successor to the powers and duties of the Arizona State Tax Commission, Appellee and Cross-Appellant.

No. 1 CA–CIV 3224.

Court of Appeals of Arizona,
Division 1,
Department A.

May 19, 1977.

Rehearing Denied July 19, 1977.

Review Denied Sept. 15, 1977.

Bilby, Thompson, Shoenhair & Warnock, P. C. by David W. Richter, Tucson, for appellant and cross-appellee.

Bruce E. Babbitt, Atty. Gen. by Ian A. Macpherson, Asst. Atty. Gen., Phoenix, for appellee and cross-appellant.

Evans, Kitchel & Jenckes, P. C. by Harold J. Bliss, Jr., Phoenix, for Phelps Dodge Corp.

## OPINION

JACOBSON, Judge.

This appeal involves a case of first impression in Arizona dealing with the statutory interpretation of A.R.S. § 42–1409(A), as amended Laws 1963, exempting from the Arizona use tax "machinery or equipment used directly" in mining and metallurgical operations.

Duval Sierrita Corporation (Duval) operates a copper mining and milling operation in Pima County, Arizona, known as the Duval Sierrita Mine. In order to place the controversy between the parties in proper perspective, an overall description of Duval's mining and milling operation is necessary.

Duval's operation is typical of an open-pit copper mine. It begins with removing the copper-bearing ore from the earth. This is accomplished by drilling, in a pattern, 50-feet deep by 12-inches wide holes, placing explosives into these holes and setting off the explosives. The resulting loosened rock is then loaded into ore trucks by huge shovels. The trucks haul the rock to a primary crusher where it is reduced in size and then placed on a conveyor belt and conveyed approximately five miles to the mill area and dumped into a coarse ore stockpile. From the coarse ore stockpile, the ore is fed into secondary crushers, where it is reduced further and then fed into the tertiary crushers. At the time the ore leaves the tertiary crushers it has been reduced to approximately three quarters of an inch in diameter. From the tertiary crushers the ore is introduced to ball mills where the reduction process is changed from a crushing operation to a grinding operation. At the end of the ball mill process the ore is the consistency of flour or dust.

At this point, water is added to the ore to become a slurry and is transported by steel pipes to the flotation cells. The water used in the Duval mining operation actually comes from the Santa Cruz Valley, located approximately nine miles from the Duval plant. It is carried overland through steel pipes by a series of booster pumps.

The flotation cells themselves consist of many banks where reagents and suppressants are added to the slurry allowing the copper and molybdenum particles to be suspended in bubbles that rise to the surface and are skimmed off. This process is repeated until the desirable minerals have been separated from the undesirable rock. The minerals then move through pipes to filters where the water is removed and the minerals dried and carried to storage bins. The undesirable rock is also carried in pipes to tanks where the water is recaptured and the resulting tailings dumped into a tailings dam.

The water that is recaptured both from the mineral slurry and the tailings slurry is then pumped back to the mill to be used again in the separation process.

With this background in mind, the controversy between Duval and the Arizona State Tax Commission (now known as the Arizona Department of Revenue) and hereafter referred to as the "Commission", centers around the use tax liability of Duval for certain equipment and materials purchased by it during the period of July 1, 1968 through December 31, 1969. This equipment and material fall into two general classifications.

The first of these classes consist of an inventory of spare and replacement parts having a value of approximately four million dollars. These spare or replacement parts are for all of the equipment used by Duval in its mining and metallurgical operations starting with the drills that make the holes for explosives, and including the shovels, trucks, motors, crushers, ball mills and flotation cells.

Whether these spare or replacement parts will ever be actually used by Duval is speculative, depending upon whether the parts they are to replace ever wear out or are damaged. However, the facts show that several of the parts are custom made and if breakage should occur, replacement from the manufacturer would take up to eighteen months. If breakage of these should occur, and no spare or replacement parts were available, Duval's operations would have to close until replacement parts were received from the manufacturer. These spare or replacement parts are normally stored by Duval either in warehouses or storage yards until their use becomes necessary. The evidence shows that Duval, at its Sierrita mine, has a turnover in this inventory of approximately two million dollars a month, including expendable items which are not in controversy in this litigation.

The second class of equipment consists of the water booster pumps which facilitate the transportation of water from the Santa Cruz Valley to Duval's Sierrita Mine, the conveyor belt that transports the ore from the primary crusher to the secondary crushers, and the various steel pipes which are used to transport slurry and water both to and from the mill to the flotation cells, including tailing piping.

Both of these classes were determined by the Commission to be subject to the Arizona use tax,[1] resulting in an additional tax liability to Duval in the sum of $57,190.30. This amount of additional tax was paid by Duval under protest and this action was brought for its recovery.

The matter was tried to the trial court on stipulated facts and cross-motion for summary judgment. The trial court determined that the first class of items (the spare and replacement parts) were subject to use tax liability and Duval has appealed that portion of the trial court's judgment. The trial court also determined that the second class of items (the pumps, conveyor belt and piping) were not subject to use tax liability and the Commission has cross-appealed from that portion of the judgment.

At time of trial, various *amici curiae* were allowed by stipulation to file briefs and orally argue the position adopted by Duval in this litigation. These *amici curiae* were also allowed to file briefs before this court. *Amici curiae* are Phelps Dodge Corporation which operates copper mines and mills at Ajo, Bisbee and Morenci, Arizona, and which also operates smelters at Ajo, Morenci and Douglas, Arizona; Inspiration Consolidated Copper Company, which operates a copper mine, mill and smelter at Miami, Arizona; Kennecott Copper Corporation, which operates a copper mine, mill and smelter at Hayden, Arizona; Magma Copper Company, which operates a copper mine and mill at Superior, Arizona, and a copper mine, mill and smelter at San Manuel, Arizona; and Empire Machinery Corporation which sells various machines, machinery and equipment to most of the copper mines in the state.

The "use tax" involved here is imposed by A.R.S. § 42–1408, which provides in pertinent part:

[1]. In addition to the "use tax" an educational excise tax and special education excise tax are likewise imposed, §§ 42–1361 and 42–1371(B), as amended (Supp.1976). The amount of these taxes is controlled by the amount of the use tax liability.

"There is levied and imposed an excise tax on the storage, use or consumption in this state of tangible personal property purchased from a retailer on or after July 1, 1956 . . .. Every person storing, using or otherwise consuming in this state tangible personal property purchased from a retailer is liable for the tax. . . ." As amended Laws 1973, Ch. 123, § 125 (Supp.1976).

The statute which Duval contends allows it to avoid this tax and which requires our interpretation is A.R.S. § 42–1409(B) which provides in pertinent part that:

"B.  In addition to the exemptions prescribed by the terms of subsection A,[2] the following categories shall also be exempt:

"1.  Manufacturing or processing. Machinery or equipment used directly in . . . metallurgical operations.  The terms . . . 'metallurgical' as used in this paragraph refer to and include those operations commonly understood within their ordinary meaning. 'Metallurgical operations' includes leaching, milling, precipitating, smelting and refining.

"2.  Mining.  Machinery or equipment used directly in the process of extracting ore or minerals from the earth for commercial purposes, including equipment required to prepare the materials for extraction and the handling, loading or transportation of such extracted material to the surface. 'Mining' includes underground, surface and open-pit operations for the extraction of ores and minerals." As amended Laws 1963, Ch. 60, § 1, Laws 1967, 3rd. S.S., Ch. 2 § 3 (Supp.1976)

### Spare or Replacement Parts

It is important at the outset of this discussion to point out that the Commission concedes that the spare or replacement parts in controversy are for "machinery or equipment" that is itself exempt from taxation under A.R.S. § 42–1409(B).

The issue as to the tax liability of these items has somewhat narrowed from the administrative level to the appellate court level.  It was apparently first contended by the Commission that these items did not constitute "machinery or equipment" as that term is used in A.R.S. § 42–1409(B).  Apparently that position has now been abandoned, and the question has now become whether these spare or replacement parts are "used directly" either in the metallurgical or mining operation.  Both parties agree that there are no Arizona cases directly on point as to whether replacement parts for exempt machinery are also exempt.

The Commission's basic contention concerning the taxability of these spare or replacement parts is that during the period of time these replacement parts are being stored they are not actually being "used directly" in the mining or metallurgical processes and therefore are not exempt under A.R.S. § 42–1409(B).  In other words, the Commission equates the term "used directly" with "actual use".  The Commission's argument in support of this statutory construction is that A.R.S. § 42–1408 makes "storage" the taxable event.  Therefore, *prima facie*, any item in storage, such as these replacement parts are prior to their actual use, is subject to the tax.  It then argues that tax exemptions are to be construed against the taxpayer and in favor of the taxing authority.  *Tucson Transit Authority, Inc. v. Nelson*, 107 Ariz. 246, 485 P.2d 816 (1971).  With this construction in mind, and with the help of A.R.S. § 42–1409(C)(7) as amended (Supp.1976) which provides that all materials not specifically exempt are taxable, the proper meaning of "used directly" means actual use.

On the other hand, Duval argues that the term "machinery or equipment used directly" refers to a class of items and if the ultimate use of this class is in direct usage in mining or milling operations, the class is exempt.

**2.**  Subsection A excludes specific tangible personal property from the tax, such as personal property held for sale which would be taxed under the transaction privilege tax (tax on gross income from sales), property which is already taxed or is exempt under laws of the United States, motor fuels and various governmental and charitable uses.

Unfortunately, the cases cited by both parties do not deal directly with this particular issue. Rather, they are judicial determinations of whether particular operating equipment or machinery actually being used at the time the tax was being imposed were "used directly" in the manufacturing process. These cases are helpful in reaching a determination as to whether the second class of property dealt with in this opinion is taxable, but they do not reach the issue as to whether replacement parts for machinery or equipment which is admittedly exempt are likewise exempt.

The closest that any of these cases come to this particular issue is *Tulsa Machinery Co. v. Oklahoma Tax Commission*, 208 Okl. 138, 253 P.2d 1067 (1953), which by way of *dicta* intimates that repair parts for exempt machinery would likewise be exempt.

█ With this paucity of authority either way, we are left with the always difficult job of determining legislative intent. *Amici curiae* have argued in their briefs before this court that the legislative purpose for the exemption statute is to encourage mining in this state so that the end product of that mining and metallurgical activity (sales of copper) is itself subject to taxation under the transaction privilege tax. *See* Annot., 30 A.L.R.2d 1439, 1444 (1953). We agree that this was the legislative purpose in enacting the exemption and with the statement of that purpose contained in *Bailey v. Evatt*, 142 Ohio St. 616, 53 N.E.2d 812 (1944):

> "The primary purpose of the statute here under consideration [exempting equipment used directly in mining] is to encourage the production of more valuable tangible personal property for sale, itself subject to the sales tax, by exempting from the operation of such tax the purchases of property used and consumed by the producer in the production of such ultimate tangible personal property, and at the same time to avoid a species of double taxation." *Id.* at 620, 53 N.E.2d at 814.

Keeping this purpose in mind, did the legislature intend by the words "used di-

rectly" to create a class of property which is exempt or did it merely intend to describe the use to which the personal property was put at the time the tax attached? Being mindful that legislators do not enact laws that have no meaning and that laws should be interpreted in a manner which does not result in absurdities, let us apply the Commission's interpretation to a hypothetical fact situation. Let us assume that a small mine owner is in the process of developing mining properties and desires to build a ball mill on the property. In order to save money, he does not buy a completed new ball mill, but acquires over a period of time the various component parts which he stores on the property prior to their being assembled into a completed ball mill. Let us further assume that this ball mill when completed and if operating would be exempt under A.R.S. § 42–1409(B) as being "used directly" in the milling operation.

Under the Commission's interpretation that equates "used directly" with actual use, the component parts of this ball mill would not be entitled to exemption because a taxable event occurred—"storage"—and during this period of time no actual use was being made of the parts. We seriously doubt that the legislature would intend such a result.

Moreover, if the Commission's interpretation was followed to its logical conclusion, the exemption would have no meaning whatsoever, for even if our hypothetical mine owner bought a new completed ball mill, it is doubtful that upon delivery it could be immediately placed into operation and therefore for some time it was not in actual use. During the time necessary for its installation, a taxable event occurred under the Commission's interpretation. Again, a result obviously not intended by the legislature.

█ We think it more logical that what the legislature intended by the use of the words "used directly" was to create a classification of personal property entitled to exemption from taxation, depending on its ultimate function in the mining or met-

allurgical processes. Such an interpretation is, in our opinion, more in keeping with the legislative purpose and avoids the administrative nightmare inherent in the Commission's interpretation. Applying this interpretation to the spare and replacement parts, it is almost conceded that their ultimate function would be part of "machinery or equipment used directly" in the mining and metallurgical operations of Duval which are exempt. We therefore hold that spare and replacement parts fall into the classification of property exempted by the legislature from use tax liability. The trial court's judgment denying Duval a refund for taxes paid on these spare or replacement parts is reversed and the matter remanded with directions to enter judgment for Duval for the amount of these taxes paid under protest.

*Conveyor Belt, Pipes and Booster Pumps*

In the previous discussion we have determined that the words "used directly" refer to the ultimate function of the machinery or equipment sought to be taxed. It now becomes necessary to define that function in terms of actual operating equipment.

■ It is readily admitted by most of the courts which have dealt with this subject that the term, "used directly", is ambiguous. *See* e. g., *Courier Citizen Co. v. Commissioner of Corp. & Tax.*, 358 Mass. 563, 266 N.E.2d 284 (1971). Because of this ambiguity, two general theories as to the meaning of these words have evolved. The first of these theories, which for the lack of a better term, can be referred to as the "Ohio rule". Under this rule, and the one that the Commission urges us to adopt here, a narrow interpretation of the word "directly" is utilized. The Ohio test is to determine when does the actual exempt activity begin and when does it end, and is the machinery or equipment in question utilized during this period. *Youngstown Building Material & Fuel Co. v. Bowers*, 167 Ohio St. 363, 149 N.E.2d 1 (1958) (holding that machinery used to bring the gravel, water and cement in a cement batch plant together were not exempt, and only the actual mix-

ing machinery qualified as being "used directly" in the manufacturing process of making cement.)

A corollary to the "Ohio rule" is that "the test is not whether the property is essential to the operation of the plant, but whether it is an actual part of the process of manufacture". *Ohio Stove Co. v. Bowers*, 171 Ohio St. 484, 485, 172 N.E.2d 295, 296 (1961) (holding that machinery used to make sand molds which were in turn used to make iron castings which the taxpayers sold, were not exempt as being "used directly" in the manufacture of the castings.)

Other states, particularly Georgia, have adopted a similar interpretation. *See Blackmon v. Screven County Industrial Dev. Auth.*, 131 Ga.App. 265, 205 S.E.2d 497 (1974); *Hawes v. Custom Canners, Inc.*, 121 Ga.App. 203, 173 S.E.2d 400 (1970).

The second theory of interpretation of the term "used directly" can be designated as the "integrated rule". Cases adopting the integrated rule are typified by *Niagara Mohawk Power Corp. v. Wanamaker*, 286 App.Div. 446, 449, 144 N.Y.S.2d 458, 461 (1955) which held the test to be applied in determining whether a disputed piece of machinery was "used directly" in the exempt process was to answer the following questions:

"(1) Is the disputed item necessary to production?

"(2) How close, physically and causally, is the disputed item to the finished product?

"(3) Does the disputed item operate harmoniously with the admittedly exempt machinery to make an integrated synchronized system?"

Other states have adopted the integrated rule. *See City of Ames v. State Tax Commission*, 246 Iowa 1016, 71 N.W.2d 15 (1955); *Arkansas Beverage Company v. Heath*, 257 Ark. 991, 521 S.W.2d 835 (1975); *Courier Citizen Co. v. Commission of Corp. & Tax, supra.*

Since Arizona has not interpreted our "used directly" statute, we are left to choose which approach best fulfills the leg-

islative purposes for the exemption previously discussed. In doing so, we are not without guidance from the statute itself. A.R.S. § 42–1409(B) clearly provides that the exempt operations "refer to and include those operations commonly understood within their ordinary meaning.

With this admonition in mind, we tend to agree, at least philosophically, with the "Ohio rule" which places perimeters around the exempt operation. The statute only exempts certain operations and obviously these operations have a beginning and an end. For example, the mining company, which mines its ore in Arizona and ships that ore by rail to Texas for smelting has completed the mining operation when the ore is loaded and the smelting company has not begun its metallurgical operation until that ore arrives in Texas. Obviously, the legislature did not intend to exempt the train and its tracks that run between these two points to fall either in the classification of mining or metallurgy.

Having said this, however, the problem is in drawing these perimeters and we believe the corollary to the "Ohio rule" and its interpretation by that state is too narrow. In our opinion, such a narrow interpretation results in what may "seem to reasonable and intelligent persons to represent the drawing of artificial and arbitrary boundaries or lines." Taft, J., dissenting in *Powhatan Mining Co. v. Peck*, 160 Ohio St. 389, 394, 116 N.E.2d 426, 428 (1953). Moreover, it appears even Ohio has modified its rule by holding in *Ohio Edison Co. v. Porterfield*, 28 Ohio St.2d 150, 153, 277 N.E.2d 195, 197 (1971) that the proper test to be applied is:

"[W]hether the purchased items were *essential* or *indispensable* in keeping the utility in continuous operation for the provision of service to the public."

In our opinion, the boundaries of the exempt operation must be drawn taking into consideration the entire operation as it is "commonly understood" which operation must, of necessity, include those items which are essential to its operation and which make it an integrated system. We so interpret the words "used directly" in A.R.S. § 42–1409(B).

■ Applying this interpretation to the disputed items here, it is clear that the metallurgical portion of Duval's Sierrita operation begins, at least, at the time the ore and native rock is introduced into the primary crusher to begin the process of reducing the material to workable size. The first disputed item is the five-mile long conveyor belt which transports the coarse ore from this primary crusher to the secondary crusher. Even in Ohio [3] this would be considered exempt as being "directly in" the metallurgical operation and we so hold.

The same can be said for the steel pipes which transport the slurry from the mill to the flotation tanks. While Ohio might make a distinction between pipes that carry the ore along and pipes which carry and dispose of waste, we see no such distinction. In our opinion, both types of pipes are part of the integrated system of recovering copper from native rock and as such are essential to that operation. The trial court properly declared these pipes exempt.

The third disputed items are the booster pumps needed to transport water from Santa Cruz Valley, nine miles from the mill to the mill itself. If we were to draw arbitrary lines, we could conclude that the water was not "used directly" until it reached the mill itself and therefore the means to transport the water to that site would be an "indirect use". Such a conclusion would ignore the realities of the mineral capturing process utilized by Duval. This process simply cannot take place without water. It is obvious that it is essential to the entire operation. We assume the Commission recognizes this, as the pipeline carrying the water from the Santa Cruz Valley and the pumps at the well heads are not disputed by the Commission. Since this

---

**3.** "[W]here the principal use of property claimed to be used 'directly in' a particular activity is in transportation to or from that activity, as distinguished from transportation which is a part of that activity or between essential steps of that activity, such use is not 'directly in' such activity . . . ." *Powhatan Mining Co. v. Peck, supra.*

water cannot reach the mill site without the use of these booster pumps, they are as much a part of the integrated system and as essential to the metallurgical operation as the pipes which carry that water. The trial court was correct in holding them exempt from use tax liability.

For the foregoing reasons, the judgment of the trial court is affirmed in part and reversed in part and the matter remanded in conformity with this opinion.

DONOFRIO, Acting P. J., and SCHROEDER, J., concur.