970 P.2d 443

STATE of Arizona, ex rel. the ARIZONA
DEPARTMENT OF REVENUE,
Plaintiff–Appellant,

v.

CAPITOL CASTINGS, INC.,
Defendant–Appellee.

No. 1 CA–TX 97–0006.

Court of Appeals of Arizona,
Division 1, Department T.

June 30, 1998.

Grant Woods, Arizona Attorney General by Sara D. Branscum, Assistant Attorney General for Plaintiff–Appellant.

Snell & Wilmer, L.L.P. by Janet E. Barton, Phoenix, for Defendant–Appellee.

Fennemore Craig, P.C. by Timothy Berg, David T. Cox, & Theodore D. Setzer, Phoenix, for Amicus Curiae Stone Container Corporation.

## OPINION

NOYES, Judge.

¶ 1   The tax court held that certain materials used in the foundries of Capitol Castings, Inc. ("Capitol") were exempt from use taxation because they were "machinery or equipment" within the meaning of Arizona Revised Statutes Annotated ("A.R.S.") section 42–1409(B)(1).   We reverse this judgment, and we overrule *Arizona Dep't of Revenue v. Cyprus Sierrita Corp.*, 177 Ariz. 301, 867 P.2d 871 (Ariz.Tax 1994), in which the tax court held that certain chemicals qualified for the same exemption.   We also hold that Capitol's counterclaim in the present case was time-barred.

### Facts and Procedural History

¶ 2   Capitol operated two foundries in Arizona during the audit period of November 1987 through September 1991.   As relevant here, Capitol manufactured grinding balls for

the mining industry and custom castings for the mining industry and other industries. Capitol produced these balls and castings by melting scrap metals in arc furnaces, adding alloys, and pouring the molten metal into molds. Capitol made the molds in-house, using silica sand, chemical binders, exothermic sleeves, mold cores, mold wash, and hot topping. The chemical binders helped the sand retain its shape and form the mold. The mold core, which was made from sand, was placed in the mold to form desired shapes in the product. The wash was sprayed on to seal the mold so that sand did not get into the product and molten metal did not penetrate into the sand.

¶3 The sleeve was inserted into the mold, like a stove pipe, and molten metal was poured into the sleeve, filling the mold and part of the sleeve. The topping was then added, which helped the metal in the sleeve stay molten. As the metal in the mold cooled and contracted, the resulting space was filled with molten metal from the sleeve. After the metal hardened, the product was shaken out of the mold. The sleeves, hot topping, chemical binders, and mold wash were consumed in one molding process. About 85% of the sand was reclaimed and reused; the remainder was lost due to spillage or fracturing.

¶4 After the grinding balls were removed from the molds, they were hardened in a heat-treat furnace. Because the balls were heavy, the furnace belts and conveyors would be seriously damaged if the furnace lost electrical power while in operation. As a precaution, Capitol purchased a diesel-powered generator, which was connected to the furnace and would automatically activate to keep the furnace running in a power outage.

¶5 The furnaces generated toxic fume dust, which was confined in a duct system and captured in filters. In one of its furnaces, Capitol detoxified the dust by blowing cement and lime into it as it passed through the duct system. Capitol lined some of its machinery with refractory materials (coxy sand or cerwool blankets) to protect it from the molten metal. These materials were destroyed by the molten metal and were replaced between once a week and once a month.

¶6 The Arizona Department of Revenue ("ADOR") assessed use taxes based on Capitol's purchases of the items we have just discussed. Capitol appealed to the state board of tax appeals on grounds that these items were exempt from use taxation. On November 15, 1995, the board ruled in favor of Capitol on all items except the generator, on which it upheld ADOR's assessment. On January 12, 1996, ADOR appealed the decisions adverse to it by filing a complaint in the tax court. On February 7, 1996, Capitol filed an answer, and a counterclaim seeking reversal of the board's decision on the generator. ADOR moved to dismiss the counterclaim as untimely, and the tax court denied the motion. The tax court then considered stipulated facts and brief testimony and ruled that all items (including the generator) were exempt from the use tax. ADOR appealed. We have jurisdiction pursuant to A.R.S. section 42–124(D)(2) (Supp.1997).

## Timeliness of the Counterclaim

¶7 In *State ex rel. Arizona Dep't of Revenue v. Dillon*, 170 Ariz. 560, 562–63, 826 P.2d 1186, 1188–89 (App.1991), we held that, under section 42–124,[1] a decision of the board

---

1. A.R.S. section 42–124 (1991) provides:

   A. A person aggrieved by a final decision or order of the department under this article may appeal to the state board by filing a notice of appeal in writing within thirty days after the receipt of the decision or order from which the appeal is taken.... On determining the appeal the board shall issue a decision consistent with its determination. The board's decision is final on the expiration of thirty days from the date when notice of its action is received by the taxpayer, unless either the department or the taxpayer brings an action in superior court as provided in subsection B.

   B. The department or a taxpayer aggrieved by a decision of the board may bring an action in superior court subject to the following provisions:

       ....

   2. ... The action shall not begin more than thirty days after the order or decision of the board becomes final. Failure to bring the action within thirty days constitutes a waiver of the protest and a waiver of all claims against this state arising from illegality in the tax, penalties and interest so paid.... The superior court shall hear and determine the appeal as a trial de

of tax appeals becomes final thirty days after the taxpayer receives it, and any appeal to the tax court must be filed within thirty days following the date of finality. Here, Capitol received the board's decision on November 16, 1995, the decision became final on December 16, 1995, and any appeal had to be filed on or before January 15, 1996. ADOR's January 12 appeal met this deadline; Capitol's February 7 counterclaim did not.

¶ 8 Capitol argues that its counterclaim was timely for four reasons: (1) it was a claim for recoupment; (2) the filing of ADOR's appeal prevented the board's decision from becoming final; (3) ADOR's appeal placed its entire assessment in issue; and (4) because the appeal is a trial *de novo*, the entire assessment is open for review by the tax court. These arguments all fail.

¶ 9 First, the counterclaim was not a recoupment; it sought affirmative relief from use taxes assessed on the generator. "Recoupment is an equitable doctrine and, therefore, the claim of the defendant can be used to reduce or eliminate a judgment, but it cannot be used for purposes of affirmative relief." *W.J. Kroeger Co. v. Travelers Indem. Co.*, 112 Ariz. 285, 288, 541 P.2d 385, 388 (1975).

¶ 10 Second, in arguing that ADOR's appeal prevented the decision from becoming final, Capitol misinterprets the final sentence of section 42–124(A). As we concluded in *Dillon*,

> Subsection (A) provides that "[t]he board's decision is *final* on the expiration of thirty days from the date when notice of its action is received by the taxpayer, unless either the department or the taxpayer brings an action in superior court as provided in subsection B." (Emphasis added.) Subsection (B)(2) commences the running of the 30–day period for the filing of an appeal to the superior court from the date the Board's decision "becomes" final. This "finality" clearly refers back to the special definition of "finality" established by subsection (A). Subsections (A) and (B) are *in pari materia*, and it is plain

that the legislature intended the term "final" to carry the same meaning in both. Accordingly, the 30–day period provided by subsection (B)(2) for filing an action in superior court begins to run, pursuant to subsection (A), on the expiration of 30 days following the taxpayer's receipt of notice of the Board's decision.

170 Ariz. at 562–63, 826 P.2d at 1188–89.

¶ 11 Third, Capitol's contention that ADOR's appeal placed its entire assessment in issue is based on the complaint's introductory allegation that "[t]he Department brings this action to determine the validity of its assessment for the audit period." Capitol ignores other, more specific statements in ADOR's complaint, such as this one: "The Decision of the Board is in error to the extent it holds that any of Capitol's purchases are ... exempt from use tax under A.R.S. § 42–1409(B)(1)." Obviously, ADOR's appeal did not ask the tax court to reverse the one claim on which ADOR had prevailed before the board.

¶ 12 Fourth, subsection (B)(2)'s *de novo* requirement does not define the issues on appeal; it defines the standard of review for the issues raised in the parties' pleadings on appeal. "The characterization of the review as constituting a trial *de novo* does have relevance to the scope of review, but it does not change the essential character of the proceeding as an appeal." *Arizona Dep't of Revenue v. Navopache Electric Co–Op, Inc.*, 151 Ariz. 318, 322, 727 P.2d 813, 817 (App. 1986) (quoting *Inspiration Consol. Copper Co. v. Arizona Dep't of Revenue*, 147 Ariz. 216, 709 P.2d 573 (App.1985)). Only Capitol was "aggrieved" by the board's decision on the generator; therefore, only Capitol could appeal that decision. *See* A.R.S. § 42–124(B) (providing right to appeal to those who are "aggrieved" by a decision of the state board of tax appeals).

¶ 13 In conclusion, we hold that Capitol's counterclaim was untimely, and that the tax court erred in denying ADOR's motion to dismiss it. Because we reverse on procedur-

novo. Either party to such action may appeal to the court of appeals or supreme court as provid-

ed by law.

al grounds here, we do not reach the merits of Capitol's claim that the board erred in failing to grant a use tax exemption for the generator.

### The Section 42–1409(B)(1) Exemption

¶ 14 The tax court concluded that the materials in question were exempt from use taxation because they were "[m]achinery or equipment used directly in manufacturing" under A.R.S. section 42–1409(B)(1). This section provides as follows:

B. In addition to the exemptions allowed by subsection A of this section, the following categories of tangible personal property are also exempt:

1. Machinery or equipment, used directly in manufacturing, processing, fabricating, job printing, refining or metallurgical operations. The terms "manufacturing", "processing", "fabricating", "job printing", "refining" and "metallurgical" as used in this paragraph refer to and include those operations commonly understood within their ordinary meaning. "Metallurgical operations" includes leaching, milling, precipitating, smelting and refining.

A.R.S. § 42–1409(B)(1) (Supp.1997).

¶ 15 Tax exemption statutes must be reasonably and strictly construed in a manner that gives effect to legislative intent. *See Ebasco Services Inc. v. Arizona State Tax Comm'n,* 105 Ariz. 94, 99, 459 P.2d 719, 724 (1969); *Brink Elec. Const. Co. v. Arizona Dep't of Revenue,* 184 Ariz. 354, 358, 909 P.2d 421, 425 (App.1995). *See also Meredith Corp. v. State Tax Comm'n,* 23 Ariz.App. 152, 153, 531 P.2d 197, 198 (1975) (holding that videotape recorder used by television station to tape live programs and commercials for later broadcast was not "equipment used directly in a processing operation" within exemption of section 42–1409(B)(1)).

¶ 16 Before discussing the facts in this particular case, we discuss another case in which the tax court broadly construed the "machinery or equipment" exemption of section 42–1409(B)(1). In *Cyprus Sierrita,* 177 Ariz. at 302, 867 P.2d at 872, the tax court held that chemicals used to extract cathode copper from copper ore were "machinery or

equipment" under section 42–1409(B)(1). In equating "chemicals" with "machinery," the *Cyprus* court reasoned as follows:

"Machinery" is defined as "machines as a functioning unit." "Machine" in turn is defined as:

[A]n assemblage of parts that are usually solid bodies but include in some cases fluid bodies or electricity in conductors and that transmit forces, motion and energy one to another in some predetermined manner and to some desired end.

. . . .

These chemicals are "machines" according to those definitions because they are an integral part of a complicated process, acting in predetermined manners to obtain a specific desired result. . . . Clearly, these chemicals function as part of the cathode copper plating "machinery" and as such are exempt from the use tax under section 42–1409, subsection B(1).

The chemicals also function as part of Cyprus' "equipment" as that term is commonly defined. *Webster's* defines "equipment" to include "the physical resources serving to equip a person or thing . . . as: (1) the implements (as machinery or tools) used in an operation or activity."

. . . .

The chemicals fall within these common definitions of "equipment" thereby qualifying for tax exempt treatment under section 42–1409, subsection B(1).

*Id.* at 303–04, 867 P.2d 873–74 (footnotes and citations omitted).

¶ 17 *Cyprus* acknowledged that words in statutes are to be given their ordinary meaning unless the context requires otherwise, but it did not acknowledge that tax exemptions must be strictly construed. The court adopted a definition of "machine" from Webster's Third New International Dictionary, but excluded its parenthetical examples. In full, the definition reads:

f(1) : an assemblage of parts that are usu. solid bodies but include in some cases fluid bodies or electricity in conductors and that transmit forces, motion, and energy one to another in some predetermined manner and to some desired end (as for sewing a

seam, printing a newspaper, hoisting a load, or maintaining an electric current)

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1353 (1971).

¶ 18   Although the *Cyprus* court chose an appropriate dictionary definition of "machine," it disregarded crucial portions of that definition and misapplied others.  The court concluded that chemicals are "machines" because they act "in predetermined manners to obtain a specific desired result," but it ignored the part of the definition that specifies that a machine acts in this way as "an assemblage of parts ... that transmit forces, motion and energy one to another...."  As a result, the court's analysis took it far beyond the definition's examples of the actions of a machine: "sewing a seam, printing a newspaper, hoisting a load, or maintaining an electric current."

¶ 19   The *Cyprus* court took an equally broad approach in deciding that chemicals were "equipment."  It began with a portion of the appropriate definition of "equipment," which reads:

> 2  a:  the physical resources serving to equip a person or thing <funds for buildings and ˉ<the vocalˉof a singerˉ<a new jail became part of the municipal—*Amer. Guide Series: Va.ˉ* as (1): the implements (as machinery or tools) used in an operation or activity: APPARATUS <where a tractor is standard ˉ<sportsˉ(2): all the fixed assets other than land and buildings of a business enterprise <the plant,ˉand supplies of the factoryˉ

WEBSTER'S at 768.  However, the court omitted the portion of the definition that is most relevant in a business setting—the "fixed assets" of a business enterprise other than land and buildings.  *Cyprus Sierrita*, 177 Ariz. at 303, 867 P.2d at 873.  The court also relied on a broad statement that "equipment" and other related terms "can signify, in common, all the things used in a given work or useful in effecting a given end.  Equipment usually covers everything except personnel needed for efficient operation or service...."  *Id.* From this, the court concluded that "[t]he chemicals fall within these common defini-

tions of 'equipment'...."  *Id.* at 304, 867 P.2d at 874.

■■■  ¶ 20   A court does not construe an exemption statute "reasonably and strictly" by interpreting its words broadly, expansively, or figuratively, or by blending selected portions of abstract definitions to achieve a desired result.  Because we conclude that *Cyprus* applied an overbroad rule of construction and reached a clearly erroneous result, we overrule it.

¶ 21   We now discuss and distinguish the case primarily relied upon by the tax court and Capitol in this case.  We refer to *Duval Sierrita Corp. v. Arizona Dep't of Revenue*, 116 Ariz. 200, 202, 568 P.2d 1098, 1100 (App. 1977), in which ADOR assessed use taxes on the purchase of spare and replacement parts.

¶ 22   The contested issue in *Duval* was whether the taxpayer used the spare and replacement parts "directly" in its copper mining activities.  *Id.* at 203, 568 P.2d at 1101.  The opinion cautioned, "It is important at the outset of this discussion to point out that the Commission concedes that the spare or replacement parts in controversy are for 'machinery or equipment' that is itself exempt from taxation under A.R.S. § 42–1409(B)."  *Id.* The court then stated, "[W]hat the legislature intended by the use of the words 'used directly' was to create a classification of personal property entitled to exemption from taxation, depending on its ultimate function in the mining or metallurgical processes."  *Id.* at 204–05, 568 P.2d at 1102–03.

¶ 23   Capitol and *amicus curiae* argue that the above-quoted passage from *Duval* expands the "machinery or equipment" exemption to encompass all "tangible personal property whose *ultimate function* is to become part of machinery and/or equipment 'used directly' in a manufacturing and/or processing operation."  Answering Brief at 23 (emphasis in original).  *See also* Brief of *Amicus Curiae* at 9 ("Under the 'ultimate function' test, *any* item, whether a replacement part, a component part, or a constituent element, that eventually will become part of a functioning machine satisfies the 'ultimate function' test, and thus is exempt.").  This argument misconstrues *Duval.*

¶ 24  To fairly construe *Duval*'s "ultimate function" passage, one must acknowledge what the court made clear at the outset of its analysis—the fact that the spare or replacement parts in question were conceded to be parts of exempt "machinery or equipment." Given its context, *Duval*'s "ultimate function" passage meant only that the classification of exempt "machinery or equipment" included spare or replacement parts for exempt "machinery or equipment." Because the spare or replacement parts in *Duval* were conceded to be parts for exempt "machinery or equipment," and because no such concession (or fact) exists regarding the materials in question here, it is a non sequitur to argue that the materials in question here are exempt "machinery or equipment" because of *Duval*.

¶ 25  Capitol's exemption claim was based on a theory that its personalty "was exempt from the use tax because its ultimate function was to become an essential and integral part of a piece of machinery or equipment used directly in Capitol's manufacturing operations." Answering brief at 2, fn. 3. We reject this theory because it is based solely on a misconstruction of *Duval*.

### The Section 42–1409(C)(1) Exclusion

■ ¶ 26  All of the personalty at issue in this appeal is consumed during the manufacturing process; most of it is consumed in one use, some of it is consumed after a few or several uses. This means that all the materials were "expendable," which means that whether they qualified for the "machinery or equipment" exemption is a moot question because A.R.S. section 42–1409(C)(1) provides, "The exemptions provided by subsection B of this section do not include ... [e]xpendable materials."

■ ¶ 27  Capitol and *amicus curiae* argue that the "expendable materials" exclusion only applies to materials that are incidental or ancillary to the manufacturing process, and that the exclusion therefore does not apply to the materials in question here because these materials are integral to the manufacturing process. *Amicus* argues that the legislature's use of the term "materials" in the exclusion demonstrates an in-tent to distinguish "materials" from "machinery and equipment." As such, argues *amicus*, the term "expendable materials" does not refer to machinery or equipment at all, whether used in one or more manufacturing cycles. *Cyprus*—which we have just overruled—reached a similar conclusion. 177 Ariz. at 304, 867 P.2d at 874. We do not agree with this interpretation of the exclusion statute.

■ ¶ 28  Where statutory language is unambiguous, we will not infer legislative intent by induction from related provisions. *See Pfeil v. Smith*, 183 Ariz. 63, 64–65, 900 P.2d 12, 13–14 (App.1995). The language of section 42–1409(C)(1) is clear and does not limit its application to incidental or ancillary expendable materials. (The statute's use of the term "materials" is perhaps explained by the fact that the exclusion applies to all subsection B exemptions, some of which do not involve machinery or equipment.)

¶ 29  We hold that the section 42–1409(C)(1) exclusion applies to any expendable materials that might otherwise qualify for the section 42–1409(B)(1) exemption. To the extent that Attorney General Opinion 78–142 supports a different holding, we respectfully disagree with it.

¶ 30  Capitol argues that expendable materials are "used up" or "consumed," and that its materials are instead "broken down" or "destroyed" by the tremendous heat to which they are exposed. This is a distinction without a difference. "Consume" means, in part, "1: to destroy or do away with completely (as by fire, disease, famine, decomposition)." WEBSTER'S at 490.

### Conclusion

¶ 31  The judgment is reversed and remanded with directions to dismiss Capitol's counterclaim and to enter judgment for ADOR on its complaint.

GRANT, P.J., and WEISBERG, J., concur.