126 P.3d 1063

ARIZONA DEPARTMENT OF REVE-
NUE, an agency of the State of
Arizona, Plaintiff/Appellee,

v.

SALT RIVER PROJECT AGRICULTUR-
AL IMPROVEMENT AND POWER
DISTRICT, a political subdivision of the
State of Arizona, Defendant/Appellant.

The Arizona Department of Revenue, an
agency of the State of Arizona,
Plaintiff/Appellee,

v.

Arizona Public Service, an Arizona
corporation, Defendant/Appellant.

Nos. 1CA–TX04–0016, 1CA–TX04–0021.

Court of Appeals of Arizona,
Division 1, Department T.

Jan. 19, 2006.

Terry Goddard, Attorney General, by Frank Boucek, III, Assistant Attorney General, Kenneth J. Love, Assistant Attorney General, Phoenix, Attorneys for Plaintiff/Appellee.

Jennings, Strouss & Salmon, P.L.C., by David B. Earl, Stephen E. Lee, Gerald W. Alston, Phoenix, Attorneys for Defendant/Appellant Salt River Project Agricultural Improvement and Power District.

Steptoe & Johnson, L.L.P., by Patrick Derdenger, Bennett Evan Cooper, Dawn R. Gabel, Mark Vilaboy, Phoenix, Attorneys for Defendant/Appellant Arizona Public Service.

## OPINION

WINTHROP, Judge.

¶ 1 In this consolidated appeal, we analyze the meaning of the term "original plant in service cost" for purposes of valuing electric transmission and distribution property under Arizona Revised Statutes ("A.R.S.") section 42–14154 (Supp.2005).[1] The primary issue raised is whether contributions in aid of construction ("CIAC") are included in an electric utility company's original plant in service cost for valuation and taxation purposes. The tax court resolved this issue of law affirmatively, in favor of the Arizona Department of Revenue ("the Department") on cross-motions for summary judgment in each case. Because we find that the tax court misapplied the substantive law, we reverse and direct entry of judgment in favor of Salt River Project Agricultural Improvement and Power District ("SRP") and Arizona Public Service Company ("APS") (collectively "Taxpayers").

## FACTS AND PROCEDURAL BACKGROUND

### I.   The Property Taxation Framework.

¶ 2 Taxpayers each operate an electric utility company that generates, transmits, and distributes electric power in Arizona. Taxpayers both own real and personal property in Arizona, including property used to distribute that power.

¶ 3 As an agricultural improvement and power district, and a political subdivision of the State of Arizona, SRP is not required to pay property taxes to local municipalities and school districts. See Ariz. Const. art. 9, § 2(1); A.R.S. § 42–11102(A) (Supp.2005). Nevertheless, SRP elects to do so pursuant to A.R.S. § 48–242(A) (2000). In computing SRP's contribution, the Department annually determines the full cash value of the property SRP uses to generate, transmit, and distribute electrical energy.[2] See A.R.S. § 48–242(B); see also A.R.S. § 42–14151(A)(4)–(5) (Supp.2005) (requiring the Department to annually value all property, owned or leased, and used by taxpayers in generating, transmitting, or distributing electricity).

¶ 4 " 'Full cash value' for property tax purposes means the value determined as prescribed by statute." A.R.S. § 42–11001(5) (Supp.2005). This full cash value has its basis in the original plant in service cost (as adjusted) of an electric utility's property, and such cost determines Taxpayers' rate base, or the amount on which each utility's percentage of return is calculated. This figure in turn is used by Taxpayers to determine what costs they will pass on to customers. Rates paid by customers are set to allow a certain percentage return on rate base.

¶ 5 Taxpayers pay for the usual costs of constructing electrical facilities. On occa-

---

1. Throughout this opinion, we cite the current version of the applicable statutes for consistency. Nonetheless, we analyze and rely on the version of the statutes in effect for tax year 2003 (valuation year 2002). See A.R.S. § 1–244 (2002); *Merchs. Despatch Transp. Corp. v. Ariz. State Tax Comm'n*, 20 Ariz.App. 276, 279, 512 P.2d 39, 42 (1973) ("Generally, statutes and their amendments take effect on the date of enactment or on their effective dates."). Potentially material changes to the statutes, and some nonmaterial changes, are noted in this opinion. For example,

the Arizona Legislature amended A.R.S. § 42–14154 in 2003. See 2003 Ariz. Sess. Laws, ch. 37, § 3. The 2003 amendments resulted in the renumbering and re-lettering of subsections, but no changes material to this decision. The legislature effected another amendment to A.R.S. § 42–14154 in 2005. See *infra* note 5.

2. SRP and the Department agree that SRP's status as a political subdivision does not warrant treating it differently from other utilities.

sion, Taxpayers provide utility service in a non-standard manner, entailing higher installation costs than they would incur using standard construction techniques. Taxpayers purportedly incur these expenses for the benefit of the customer, not the utility, and do not include them in their rate base. Most of these expenses, at least for SRP, arise when developers wish to extend power lines to new residential and other real estate projects underground rather than above ground. In addition, landowners may require special types of cable, redundant lines, additional facilities to meet power load requirements, separate transformer vaults, or the movement of power lines so that they may change the use of their property, or a new rural or isolated customer may require an extraordinary line extension.

¶ 6 Taxpayers are allowed to pass the excess costs of non-standard installation along to those customers that benefit from it. *See, e.g.,* Ariz. Admin. Code ("A.A.C.") R14–2–206(B)(2)(c) ("A customer requesting an underground service line in an area served by overhead facilities shall pay for the difference between an overhead service connection and the actual cost of the underground connection as a nonrefundable contribution."). Taxpayers can require non-refundable contributions in cash, services, or property from those customers to make up the difference between non-standard and standard construction costs. The Arizona Administrative Code defines CIAC as "[f]unds provided to the utility by the applicant under the terms of a line extension agreement or service connection tariff the value of which is not refundable." A.A.C. R14–2–201(7); *see also* A.A.C. R14–2–206(B)(2)(b) ("The cost of any service line in excess of that allowed at no charge shall be paid for by the customer as a contribution in aid of construction."). CIAC are not included in Taxpayers' rate base, and thus, the utility companies earn nothing on those contributions.

¶ 7 APS is regulated by the Federal Energy Regulatory Commission ("FERC") and the Arizona Corporation Commission ("ACC"). *See* 18 C.F.R. ch. 1 (FERC) (1988); A.R.S. § 40–202(A) (2001) (authorizing the ACC to "supervise and regulate every public service corporation in the state"). SRP states that the FERC and the ACC do not directly regulate it, but both Taxpayers nonetheless follow the FERC Uniform System of Accounts ("USOA") for reporting by "public utilities and licensees subject to the provisions of the Federal Power Act," including in their accounting for original plant in service cost and CIAC. *See* 18 C.F.R. pt. 101. Each utility is also required to maintain its books and records in conformity with the FERC USOA. A.A.C. R14–2–212(G)(2). The FERC accounting system requires that CIAC be charged against the "plant in service" accounts. *See id.* at 312, ¶ 2(D). Thus, all construction costs incurred in connection with utility property, including CIAC, are added to the FERC plant in service accounts and then CIAC are deducted from those accounts, reducing the accounts so that only costs borne by Taxpayers are reflected in the balance.

## II.   This Litigation.

¶ 8 In computing the full cash valuation of Taxpayers' transmission and distribution property, the Department determines the original plant in service cost for such property. *See* A.R.S. § 42–14154(B)(1). For tax year 2003, the Department included Taxpayers' CIAC in valuing their property "that is used or useful for the transmission or distribution of electric power" pursuant to A.R.S. § 42–14154(G)(8).[3]

¶ 9 SRP appealed the Department's full cash valuation of $2,421,097,000 for SRP's operating property to the State Board of Equalization ("the State Board"), arguing that in computing the value of electric utility property for Arizona property tax purposes, CIAC should not be included in the original plant in service cost as computed in accordance with the FERC. APS also appealed the Department's full cash valuation of $2,842,549,000 for its property to the State

---

**3.**  The 2003 amendment rewrote and renumbered A.R.S. § 42–14154(H)(6), which had read: " 'Plant' means all property that is situated in this state and that is used or useful for the generation, transmission or distribution of electric power...." A.R.S. § 42–14154 (Historical and Statutory Notes).

Board. The State Board reduced the Department's valuation for SRP by $192,779,552 to $2,228,317,176 [4], and for APS to $2,777,490,206, based on its determination that CIAC are not included in the value of electric utility property subject to valuation for tax purposes under A.R.S. § 42–14154.

¶ 10 In accordance with A.R.S. § 42–16203 (Supp.2005), the Department filed separate appeals challenging the State Board's rulings regarding SRP and APS in the Arizona Tax Court. The Department appealed the ruling to the extent that it applied to residential contributions (related to residential property), but the Department did not appeal the portion holding that utility-to-utility contributions (contributions by one electric utility to another, usually made to give the payor access to facilities of the recipient) should not be included in the valuation. The Department argued that the key component in the valuation statute is the utility's original plant in service cost, and as defined, that cost did not expressly exclude CIAC. The Department further maintained that the correct value for SRP's plant in service account for tax year 2003 was $2,415,288,000, and for APS's plant in service account was $2,842,549,000. Taxpayers answered, arguing that the term "original plant in service cost" excludes CIAC, and the parties in each case filed cross-motions for summary judgment on the inclusion of CIAC in the valuation.

¶ 11 The tax court disagreed with the State Board's rulings and granted summary judgment to the Department in each case. The tax court determined that the Department properly included CIAC in its valuations and upheld the Department's valuation of $2,415,288,000 for SRP's property and $2,842,549,000 for APS's property. The court further ordered that Taxpayers pay any prejudgment interest due.

■ ¶ 12 Taxpayers separately and timely appealed. This court consolidated the appeals on April 1, 2005. We have jurisdiction to decide this consolidated appeal pursuant to A.R.S. §§ 12–120.21(A)(1) (2003), 12–170(C) (2003), and 12–2101(B) (2003).[5]

## ANALYSIS

### I. The FERC Regulations Support Taxpayers' Interpretation and Are Incorporated by Arizona Statute.

■ ¶ 13 We review *de novo* the tax court's grants of summary judgment to the Department. *See Walgreen Ariz. Drug Co. v. Ariz. Dep't of Revenue*, 209 Ariz. 71, 72, ¶ 6, 97 P.3d 896, 897 (App.2004). Further, this case turns on the interpretation of statutory provisions, matters that we review *de novo*. *See People's Choice TV Corp. v. City of Tucson*, 202 Ariz. 401, 403, ¶ 7, 46 P.3d 412, 414 (2002).

■■ ¶ 14 When interpreting statutes, we strive to "discern and give effect to legislative intent." *Id.* (citation omitted). In addition, "we liberally construe statutes imposing taxes in favor of the taxpayers and against the government." *State ex rel. Ariz. Dep't of*

---

4. There is a $272.00 discrepancy in the figures provided in the record.

5. On April 20, 2005, APS filed a "Notice of Supplemental Authorities," in which it noted that, after the completion of briefing in this case, Arizona Governor Janet Napolitano signed into law House Bill 2056, which amended A.R.S. § 42–14154 by adding a new subsection, (B)(3), which provides, "The department shall not value contributions in aid of construction." H.R.2056, 47th Leg., 1st Reg. Sess. (Ariz.2005). However, the amendment "applies to tax years beginning from and after December 31, 2004," *id.* at § 2; A.R.S. § 42–14154 (Historical and Statutory Notes), and the issue raised on appeal in this case involves tax year 2003. Thus, the amendment does not retroactively apply to the tax year at issue.

We are nonetheless aware that subsequent legislation clarifying a statute "is strongly indicative

of the legislature's original intent." *Cutter Aviation, Inc. v. Ariz. Dep't of Revenue*, 191 Ariz. 485, 493, 958 P.2d 1, 9 (App.1997) (quoting *Police Pension Bd. v. Warren*, 97 Ariz. 180, 187, 398 P.2d 892, 896 (1965)). However, despite the fact that the legislative history of House Bill 2056 acknowledges that "court cases are pending on this issue," including this consolidated appeal, the history does not indicate any intention by the Arizona Legislature to retrospectively clarify the meaning of the statute at issue one way or the other or to affect the outcome of the litigation. Thus, we do not rely on the amendment to resolve this appeal. *See Calik v. Kongable*, 195 Ariz. 496, 501, ¶ 21, 990 P.2d 1055, 1060 (1999) ("Subsequent history cannot always be considered when construing legislation.") (citation omitted).

*Revenue v. Capitol Castings, Inc.*, 207 Ariz. 445, 447, ¶ 10, 88 P.3d 159, 161 (2004).

¶ 15 Further, "we must read the statute as a whole and give meaningful operation to each of its provisions." *Higginbottom v. State*, 203 Ariz. 139, 142, ¶ 13, 51 P.3d 972, 975 (App.2002) (quoting *Ruiz v. Hull*, 191 Ariz. 441, 450, ¶ 35, 957 P.2d 984, 993 (1998)). If a statute's meaning is clear and unambiguous, we give effect to its plain language without resorting to other rules of construction. *Janson v. Christensen*, 167 Ariz. 470, 471, 808 P.2d 1222, 1223 (1991). This rule applies "unless the legislature has offered its own definition of the words or it appears from the context that a special meaning was intended." *State v. Reynolds*, 170 Ariz. 233, 234, 823 P.2d 681, 682 (1992) (quoting *Mid Kansas Fed. Sav. & Loan Ass'n v. Dynamic Dev. Corp.*, 167 Ariz. 122, 128, 804 P.2d 1310, 1316 (1991)) (additional citation omitted).

¶ 16 Arizona has adopted a statutory cost-based valuation method for certain types of centrally valued properties, such as electric utility property. *See* A.R.S. § 42–14154(A)–(B). The starting point for determining how electric utility company property shall be valued is A.R.S. § 42–14154:

> B. Electric transmission, electric distribution, gas distribution, combination gas and electric transmission and distribution and transmission and distribution cooperative property shall be valued as follows:
>
> 1. The department shall determine the original plant in service cost.

The original plant in service cost amount is then subject to deductions for depreciation and the effect of state or federal orders on property use, as well as additions for the costs of certain materials and supplies, and half of the cost of the construction work in progress and legally required environmental protection facilities. A.R.S. § 42–

14154(B)(2)–(E). Thus, in determining the value of electric utility property, the Department must determine the original plant in service cost of such property (as adjusted according to statute).

¶ 17 But what is the original plant in service cost? The statute defines the term "original plant in service cost" as "the *actual cost* of acquiring or constructing property including additions, retirements, adjustments and transfers, but without deducting related accumulated provision for depreciation, amortization or other purposes." A.R.S. § 42–14154(G)(7) (emphasis added).

¶ 18 The Department characterizes this definition as "unambiguous." However, the term "actual cost," used within the definition of the term "original plant in service cost," is not defined by A.R.S. § 42–14154. The Department contends that the term "actual cost" is understandable without resort to further definition. However, the parties dispute what constitutes "actual cost" and, more specifically, whether CIAC fall within the ambit of "actual cost" and thus within the ambit of "original plant in service cost." We conclude that, as applied to the facts of this case, the statute's definition is on its face ambiguous in that it raises questions regarding what constitutes "actual cost."

¶ 19 Although A.R.S. § 42–14154 does not define the term "actual cost," the statute provides us with interpretive guidance because it does state: "All terms and applications of terms shall be interpreted according to the federal energy regulatory commission uniform system of accounts for electric and gas utilities in effect on January 1, 1989." A.R.S. § 42–14154(F) [6]; *see also* A.A.C. R14–2–212(G)(2). This is a broad directive, because it extends to both defining and applying statutory phrases. Moreover, the statute does not state that the FERC USOA is to be used only to resolve statutory ambiguities; rather, the use of the word "shall" in the

---

6. Further, the valuation statute previously provided as follows: "All terms and applications of terms shall be interpreted *as nearly as possible, under the circumstances,* as contained in the federal energy regulatory commission reports for electric and gas utilities in effect on January 1, 1979." A.R.S. § 42–124.01(I) (as amended by 1980 Ariz. Sess. Laws, ch. 8, § 43) (emphasis

added). In 1989, the legislature amended the recodified provision by striking the qualifying language "as nearly as possible, under the circumstances" and replacing the reference to the FERC reports with the unqualified language. *See* A.R.S. § 42–144(I) (as amended by 1989 Ariz. Sess. Laws, ch. 132, § 10).

electric utility valuation statute "indicates that the legislature intended the statutory method of" valuation "to be mandatory." *Ariz. Dep't of Revenue v. Trico Elec. Coop., Inc.*, 151 Ariz. 544, 547, 729 P.2d 898, 901 (1986). Thus, the statute requires that all of its terms and applications be interpreted in accordance with the FERC accounting rules.

¶ 20 However, the FERC USOA does not specifically define the term "actual cost." Taxpayers nevertheless urge us to cull and rely on the relevant definition of "cost" from the FERC USOA, which defines "cost" as "the amount of money *actually paid* for property or services." 18 C.F.R. pt. 101, at 302, ¶ 9 (emphasis added). Importantly, the instructions further provide that electrical plant accounts "shall not include the cost or other value of electric plant contributed to the company." *Id.* at ¶ 2(D). We recognize that the terms "cost" and "actual cost" are different terms, and therefore the FERC USOA instructions do not necessarily bind our analysis. However, because the statutory mandate is to have all "applications of terms ... interpreted according to" the FERC USOA, *see* A.R.S. § 42–14154(F), we look to see if that interpretive guidance from FERC is clear.[7] We find that it is.

¶ 21 The FERC USOA includes definitions that apply to electric plants, including one for "electric plant in service," which means an "electric plant, included in accounts 301 to 399, prescribed herein, owned and used by the utility in its electric utility operations, and having an expectation of life in service of more than one year from date of installation." 18 C.F.R. pt. 101, at 327, ¶ 101(A). It includes intangible plant (accounts 301–03), production plant (accounts 310–46), transmis-

sion plant (accounts 350–59), distribution plant (accounts 360–73), and general plant (accounts 389–99) property. *Id.* at 355. In addition, the term "cost" means "the amount of money actually paid for property or services." *Id.* at 302, ¶ 9. The FERC Electrical Plant Instructions further provide: "All [ ] electric plant shall be included in the accounts at the cost incurred by the utility," with certain exceptions not applicable here. *Id.* at 312, ¶ 2(A). Because CIAC represent the cost to customers who actually generate and pay those costs, not a cost to the utility, the FERC USOA specifically instructs the utility to exclude CIAC from its cost accounts: "The electric plant accounts shall not include the cost or other value of electric plant contributed to the company." *Id.* at 312, ¶ 2(D). Furthermore, the instructions direct that CIAC must be excluded from the cost calculation, as opposed to a separate deduction from cost:

> Contributions in the form of money or its equivalent toward the construction of electric plant shall be credited to accounts charged with the cost of such construction. Plant constructed from contributions of cash or its equivalent shall be shown as a reduction to gross plant constructed when assembling cost data in work orders for posting to plant ledgers of accounts.

*Id.* In its electric plant accounts for the "cost installed" of station equipment (account 353), underground conduit (account 366), or installations on customers' premises (account 371), a utility records the "gross cost" of construction as a debit (in this case, an addition) and CIAC as a credit (in this case, a subtraction). *Id.* at 312, 327, 355, 366–71. Thus, under the FERC system of accounts, "cost" means the

---

**7.** Also, if a term is not specifically defined by the legislature, we strive to apply the plain and ordinary meaning of the term within the context of the statute. *See State v. Hoggatt*, 199 Ariz. 440, 443, ¶ 8, 18 P.3d 1239, 1242 (App.2001). Black's Law Dictionary has previously defined the term "actual cost" as follows:

> The actual price paid for goods by a party, in the case of a real *bona fide* purchase, which may not necessarily be the market value of the goods. It is a general or descriptive term which may have varying meanings according to the circumstances in which it is used. It imports the exact sum expended or loss sustained rather than the average or proportional part of the cost. Its

meaning may be restricted to materials, labor, and overhead or extended to other items. Black's Law Dictionary 35 (6th ed.1990); *see also* Black's Law Dictionary 38 (8th ed.2004) (defining "actual" as follows: "Existing in fact; real."); Webster's New Collegiate Dictionary 12 (1975) (defining "actual" in part as "existing in fact or reality" and "not false or apparent"). Similarly, Black's Law Dictionary has defined the term "cost" as follows: "Expense; price. The sum or equivalent expended, paid or charged for something. *See also Actual cost;* Costs; Net cost; Rate." Black's Law Dictionary 345 (6th ed.1990) (emphasis added).

cost the utility incurs to construct the electrical plant net of CIAC. Accordingly, the FERC USOA instructions regarding "cost" support the conclusion that CIAC should ultimately not be included in Taxpayers' "actual cost." [8]

¶ 22 Further, if the term "actual cost" remains ambiguous after considering the interpretive guidance provided by the legislature, and applying standard rules of construction, we must resolve the ambiguity by construing the term in favor of Taxpayers. *See Capitol Castings*, 207 Ariz. at 447, ¶ 10, 88 P.3d at 161; *People's Choice TV*, 202 Ariz. at 403, ¶ 7, 46 P.3d at 414; *Wilderness World, Inc. v. Dep't of Revenue*, 182 Ariz. 196, 199, 895 P.2d 108, 111 (1995).

## II. The Arizona Legislature Has Mandated That the FERC Rate–Making Concepts Apply in Interpreting the Property Tax Statutes.

¶ 23 The Department nonetheless argues that reliance on the FERC USOA to interpret A.R.S. § 42–14154 and ultimately exclude CIAC from Taxpayers' taxable property is contrary to the principles underlying property taxation in Arizona. Specifically, the Department contends that Taxpayers erroneously rely on a "rate-making" system that has no place in the interpretation of property tax valuation statutes,[9] and fail to realize that CIAC represents a benefit that Taxpayers receive from the increased value of their property as a result of the contributions of their customers.

¶ 24 The Department relies on cases from Maine, Michigan, and Kansas in arguing that there is no connection between rate-making and tax rules. *See Maine Consol. Power Co.*

*v. Inhabitants of Farmington*, 219 A.2d 748, 750–51 (Me.1966); *Consumers Power Co. v. Big Prairie Twp.*, 81 Mich.App. 120, 265 N.W.2d 182, 191 (1978), *superseded by statute as stated* in *County of Wayne v. Mich. State Tax Comm'n*, 261 Mich.App. 174, 682 N.W.2d 100 (2004); *Mobil Pipeline Co. v. Rohmiller*, 214 Kan. 905, 522 P.2d 923, 936–37 (1974). Its reliance on these authorities is misplaced. These cases interpret various states' tax laws that neither adopt nor refer to the FERC accounting rules.

¶ 25 In contrast, our legislature has expressly adopted a statutory method for the valuation of utilities in Arizona that incorporates the FERC USOA. *See* A.R.S. § 42–14154(F); A.A.C. R14–2–212(G)(1)–(2) (providing for the keeping of accounts and records to reflect the cost of the utility's properties in conformity with the FERC USOA), R14–2–103(A)(3)(h) (providing that "original cost rate base" means cost "exclusive of contributions and/or advances in aid of construction"). The Department, however, attempts to inject general notions of fair market value into the statutory method, despite the fact that the legislature has opted for a different valuation system. The taxation of utility companies marks a rare instance in which the Arizona Legislature has "used its power to prescribe an alternative to the fair market value concept of full cash value for tax valuation purposes." *Business Realty of Ariz., Inc. v. Maricopa County*, 181 Ariz. 551, 554 & n. 4, 892 P.2d 1340, 1343 & n. 4 (1995) (distinguishing between valuations of shopping centers and other entities, including utilities).

¶ 26 In *Business Realty*, our supreme court explained that the "special valuation

---

8. On the other hand, in *SFPP, L.P. v. Arizona Department of Revenue*, 210 Ariz. 151, 108 P.3d 930 (App.2005) (review denied Sept. 27, 2005), conflicting FERC USOA directives did not provide clear direction and required us to consider other factors. *See id.* at 155, ¶¶ 17–22, 108 P.3d at 934. In contrast, here, although "actual cost" and "cost" are not identical terms, the explicit provisions from FERC USOA make it clear that CIAC are not to be included when construing such terms.

9. While the Department applies the FERC USOA to interpret "depreciation," "plant construction

costs," "construction work in progress," and "electric plant acquisition adjustments," it insists that the FERC rule explaining "cost" is wholly inapplicable in interpreting "actual cost." Without question, the Arizona Legislature knows how to exclude items from the sweep of the FERC if it chooses to do so. *See, e.g.*, A.R.S. § 42–14154(G)(1) (excluding land rights and licensed vehicles from the definition of "construction work in progress"). Thus, the legislature could have prescribed an exception to the FERC rules for CIAC. The legislature has chosen not to do so.

method for gas and electric utility district property" was an instance where "lawmakers [had] chosen a valuation method that completely disregarded market value and specified the formula to be followed, instead of allowing the reviewing body to estimate the final value when 'necessary' by use of 'other valuation factors.'" *Id.* at 557, 892 P.2d at 1346 (citation omitted). "[U]nique tax treatment [is] afforded owners of such peculiar property as ... utilities ..., for which there is, practically speaking, little or no market at all and which therefore require the use of convoluted mathematical formulae just to make a reasonable estimate of their value for taxation purposes." *Id.* at 560, 892 P.2d at 1349. Accordingly, the statutory cost-based method applies for valuation of utilities in Arizona, rather than a method based on fair market value.

¶ 27 Under the Department's view, CIAC are included in valuations to increase a utility's property taxes. But as Taxpayers point out and we have recognized, the legislature has expressly incorporated the FERC USOA excluding CIAC into Arizona law. Under the FERC USOA, CIAC are excluded from the rate base, and therefore they earn no return to the utility and are not properly incorporated into the tax base.

¶ 28 Like the Department, the tax court relied on the assumption that CIAC yield value to the utility that must be taxed. In ruling on the SRP case, the court stated, "The utility company ultimately benefits from any additions or enhancements to its utility delivery system, if not directly in the setting of its rates, indirectly in the enhanced value of its holdings." However, the purported value to Taxpayers is beside the point: the statute requires valuation at *cost*. Simply stated, the issue is not what additional value or utility could accrue to Taxpayers.[10]

## CONCLUSION

¶ 29 We hold that the Department may not include CIAC in the tax base when valuing Taxpayers' property. Consequently, we reverse the grants of summary judgment to the Department and direct the entry of judgment in favor of Taxpayers.[11] APS has requested an award of its costs and attorneys' fees incurred in the appeal pursuant to A.R.S. § 12–348 (2003). Upon its compliance with Rule 21(a) and (c) of the Arizona Rules of Civil Appellate Procedure ("ARCAP"), we grant APS its reasonable attorneys' fees, and we grant both Taxpayers their costs upon their compliance with ARCAP 21(a) and (b).

CONCURRING: DANIEL A. BARKER, Presiding Judge and SHELDON H. WEISBERG, Judge.

---

10. The Department contends that valuing line extensions financed by CIAC at Taxpayers' cost would create a property tax exemption for such extensions. If a customer provides eighty percent of the cost of a line extension, then the value of the line extension to Taxpayers is the remaining twenty percent, the cost assigned to Taxpayers. As Taxpayers point out, eighty percent of the line is not exempt from tax. In this case, cost is a measure of the tax base, not a factor in determining whether the property should be taxed at all.

Likewise, the Department predicts that the line extensions will be undervalued. That will not be the case. The statute bases the property tax value on cost, not on replacement or market values.

11. Because we reverse the tax court's judgments, we need not address APS's further argument that the tax court erred in awarding prejudgment interest to the Department.