244 P.3d 592

**CNL HOTELS AND RESORTS, INC., a Maryland corporation; and Marriott Desert Ridge Resort, LLC, a Delaware limited liability company, Plaintiffs/Appellants,**

v.

**MARICOPA COUNTY, a political subdivision of the State of Arizona, Defendant/Appellee.**

**No. 1 CA–TX 09–0003.**

Court of Appeals of Arizona, Division 1, Department T.

Dec. 28, 2010.

Gallagher & Kennedy, P.A. By Mark A. Fuller, Brian W. LaCorte, James G. Busby, Jr., Phoenix, Attorneys for Plaintiffs/Appellants.

Helm & Kyle, Ltd. By Roberta S. Livesay, Raushanah Daniels, Tempe, Attorneys for Defendant/Appellee.

## OPINION

DOWNIE, Judge.

¶ 1 This is a property tax challenge to the classification of property located on State-owned land. The Arizona Tax Court granted summary judgment to defendant/appellee Maricopa County (the "County"), concluding it had properly classified plaintiffs'/appellants' ("Taxpayers") property as class one.

We reverse and hold that the property should be classified as class nine because the necessary governmental reversionary interest exists.

## FACTS AND PROCEDURAL HISTORY

¶ 2 CNL Hotels and Resorts, Inc. holds and owns Desert Ridge Resort, L.L.C. ("Desert Ridge"). Desert Ridge has a contractual relationship with Marriott International, Inc., whereby Desert Ridge operates the JW Marriott at Desert Ridge Resort and Spa and two affiliated golf courses (the "Improvements"). The resort, located in northeast Phoenix, includes 950 guest rooms, approximately 200,000 square feet of convention and meeting space, four acres of swimming pools, tennis facilities, and a 32,000 square foot spa. The Improvements lie within the 5700–acre Desert Ridge master-planned community on land (the "Property") held in trust by the Arizona State Land Department ("SLD") for the benefit of Arizona schools.

¶ 3 Taxpayers succeeded in interest to two 99–year ground leases between Northeast Phoenix Partners and the State of Arizona— one for the resort and convention facilities and the other for the golf courses (the "Leases"). In relevant respects, the Leases are identical. The Lease terms expire July 6, 2092.

¶ 4 For the 2006 tax year, the County set the following cash values for the Improvements: $136,146,821 for the hotel/convention facilities and $2,659,172 for the golf courses. The County taxed Taxpayers based on a class one classification. See Ariz.Rev.Stat. ("A.R.S.") § 42–12001 (2006). The County used the same classification for the 2003 to 2005 tax years.

¶ 5 Taxpayers filed a complaint in the tax court in January 2007. They argued, inter alia, that the Improvements qualified for the more favorable class nine status. They sought declaratory relief and a tax refund. A later-filed action, raising the same issue for tax years 2003 to 2005, was consolidated with this case.

¶ 6 The County moved for summary judgment, arguing that, as a matter of law, the

Improvements were properly classified. The tax court granted the County's motion and entered judgment on October 6, 2009. This timely appeal followed.

## DISCUSSION

### I. Standard of Review

¶ 7 We review the grant of summary judgment *de novo*. *Wilderness World, Inc. v. Ariz. Dep't of Revenue*, 182 Ariz. 196, 198, 895 P.2d 108, 110 (1995). Interpretation of statutes raises questions of law, and we owe no deference to the tax court's interpretation. *Turf Paradise, Inc. v. Maricopa County*, 179 Ariz. 337, 340, 878 P.2d 1375, 1378 (App. 1994).

¶ 8 Courts liberally construe statutes imposing taxes in favor of taxpayers and against the government. *Ariz. Dep't. of Revenue v. Salt River Project Agric. Improvement & Power Dist.*, 212 Ariz. 35, 38, ¶ 14, 126 P.3d 1063, 1066 (App.2006); *see also City of Phoenix v. Borden Co.*, 84 Ariz. 250, 252–53, 326 P.2d 841, 843 (1958) (statutes establishing property tax liability—in contrast to those creating an exemption—are "most strongly construed against the government and in favor of the taxpayer...."); *SFPP, L.P. v. Ariz. Dep't of Revenue*, 210 Ariz. 151, 153, ¶ 8, 108 P.3d 930, 932 (App.2005). The classification of property establishes tax liability. Contrary to the County's claim, we are not dealing here with tax exemptions or deductions, which are construed strictly against taxpayers. *See Ariz. Dep't of Revenue v. Raby*, 204 Ariz. 509, 511, ¶ 16, 65 P.3d 458, 460 (App.2003).

### II. Classification

¶ 9 Arizona's tax code establishes a property tax classification scheme with assessment ratios ranging from one percent (class nine) to twenty-five percent (class one). A.R.S. §§ 42–12001 to –12010 (2006). Section 42–12009 addresses class nine. It states, in relevant part:

A. For purposes of taxation, class nine is established consisting of:

1. Improvements that are located on federal, state, county or municipal property and owned by the lessee of the property if:

(a) The improvements become the property of the federal, state, county or municipal owner of the property on termination of the leasehold interest in the property.

(b) Both the improvements and the property are used primarily for athletic, recreational, entertainment, artistic, cultural or convention activities.

¶ 10 The parties agree that Taxpayers own the Improvements and that the Improvements are located on state land. The County contends, though, that because Taxpayers have the ability to remove or destroy the Improvements during the Lease term, there is no guarantee the Improvements will revert to the State, and Taxpayers thus cannot satisfy the requirements of A.R.S. § 42–12009(A)(1)(a).

¶ 11 As the County has acknowledged, its interpretation creates a conundrum: while a taxpayer must own the improvements located on government land to qualify for class nine status, the key attributes of ownership—including the power to remove, alter, or destroy the Improvements—supposedly defeat the required reversionary interest. *See, e.g., Cutter Aviation, Inc. v. Ariz. Dep't of Revenue*, 191 Ariz. 485, 490–91, 958 P.2d 1, 6–7 (App.1997) (construing "ownership," which is undefined in Title 42, as "necessarily includ[ing] the right to control and dispose of the asset"). The County's expert conceded that this interpretation renders class nine a "vacant class."

¶ 12 In construing a statute, our goal is "to fulfill the intent of the legislature that wrote it." *Zamora v. Reinstein*, 185 Ariz. 272, 275, 915 P.2d 1227, 1230 (1996) (quoting *State v. Williams*, 175 Ariz. 98, 100, 854 P.2d 131, 133 (1993)). We consider the statute's context, its language, historical background and subject matter, its effects and consequences, and its purpose and spirit. *Hayes v. Cont'l Ins. Co.*, 178 Ariz. 264, 268, 872 P.2d 668, 672 (1994). Courts "apply practical, common sense constructions rather than hypertechnical ones that would tend to frustrate legislative intent." *State v. Seyrafi*, 201 Ariz. 147,

150, ¶ 11, 32 P.3d 430, 433 (App.2001). Additionally, in interpreting statutes, we strive to avoid an absurd result, which is defined as one "so irrational, unnatural, or inconvenient that it cannot be supposed to have been within the intention of persons with ordinary intelligence and discretion." *State v. Estrada*, 201 Ariz. 247, 251, ¶ 17, 34 P.3d 356, 360 (2001) (quoting *Perini Land & Dev. Co. v. Pima County*, 170 Ariz. 380, 383, 825 P.2d 1, 4 (1992)); *see also State Farm Auto. Ins. Co. v. Dressler*, 153 Ariz. 527, 531, 738 P.2d 1134, 1138 (App.1987) ("Statutes are not to be interpreted woodenly and without regard for their aim.").

¶ 13 The County's interpretation of A.R.S. § 42–12009 leads to an absurd result. Class nine would be rendered meaningless because no taxpayer could establish both the requisite ownership interest and the necessary governmental reversionary interest. The County's interpretation is also inconsistent with legislative history, which reflects an intent to encourage certain types of private development on public land, including convention-related facilities.

¶ 14 In 1994, the legislature added class thirteen to the property tax classification scheme, which gave preferential treatment to certain private development of public land if the government maintained a reversionary interest in the improvements. The statute was reenacted, *see* 1997 Arizona Session Laws, ch. 150, § 172 (1st Reg.Sess.), and ultimately became class nine, renumbered as A.R.S. § 42–12009. *See* 1999 Ariz. Sess. Laws, ch. 344, §§ 11, 19 (1st Reg.Sess.). Some of the statutory changes affecting the taxation of property on government land were triggered by judicial rulings, including a 1993 Arizona Tax Court determination that the earlier practice of exempting certain possessory interests was unconstitutional. 1996

Ariz. Sess. Laws ch. 349, §§ 1(B)–(C), 5 (2d Reg. Sess.); Final Revised Fact Sheet for S.B. 1116, 42d Leg., 2d Reg. Sess. (May 7, 1996) (tracing the chronology); *see also Cutter Aviation*, 191 Ariz. at 487–88, 958 P.2d at 3–4. The legislature acted "[i]n an attempt to keep with past legislative decisions to provide tax relief for owners of certain possessory interests." Final Revised Fact Sheet, S.B. 1116 at 1.

¶ 15 Against this backdrop, the County's contention that Taxpayers merit class one treatment—the highest possible level of taxation, rather than class nine—the lowest property tax bracket—is untenable. Such a result not only violates legislative intent, but leads to the absurd result that no taxpayer can qualify for class nine status. "In interpreting statutes, courts are under a duty to give statutes operation and effect and should avoid a construction that leaves the statute meaningless or of no effect." *St. Joseph's Hosp. & Med. Ctr. v. Maricopa County*, 130 Ariz. 239, 248, 635 P.2d 527, 536 (App.1981); *see also Kriz v. Buckeye Petroleum Co.*, 145 Ariz. 374, 379, 701 P.2d 1182, 1187 (1985) (adopting the only interpretation that would give meaning to two different statutory provisions).

¶ 16 No Arizona cases are on point. Neither *Calpine Construction Finance Co. v. Arizona Department of Revenue*, 221 Ariz. 244, 211 P.3d 1228 (App.2009), relied on by the tax court, nor *Stewart Title & Trust of Tucson v. Pima County*, 156 Ariz. 236, 751 P.2d 552 (App.1987), cited by Taxpayers, provides substantial guidance.

¶ 17 In *Calpine*, the disputed question was whether the taxpayer or an Indian tribe owned improvements located on tribal land. 221 Ariz. at 248, ¶ 15, 211 P.3d at 1232. Ownership is not an issue in the case at bar.[1] The statute at issue in *Stewart Title* express-

---

1. *Calpine* briefly discussed the future status of the improvements at issue in that case, stating:
   [The expert's] conclusions are based on assumptions concerning future events that are by no means certain. We do not believe that current ownership is controlled by speculation as to whether the assets will still be of use at some future time. The issue is which party the Lease gave present rights of ownership. As discussed above, Calpine holds those rights under the Lease.

221 Ariz. at 249, ¶ 21, 211 P.3d at 1233. This language could be read to support Taxpayers' view that, because the Improvements are currently intact, the necessary reversionary interest exists. Read in context, though, we find *Calpine* to be limited to the ownership inquiry and thus ultimately unhelpful in resolving questions regarding the State's reversionary interest.

ly directed that property be valued based on "current usage," which was defined as "the use to which property is put at the time of valuation." 156 Ariz. at 240, 751 P.2d at 556. Because the taxpayer's property was then leased for grazing, it was properly classified as agricultural, notwithstanding the owner's admitted goal of selling it for development purposes. *Id.*

¶ 18 According to Taxpayers, we can reconcile the requirements of § 42–12009 by reading the statute "in the present tense, such that the proper tax rate is based on currently existing conditions." Although an imperfect reconciliation, we agree that focusing on the present existence of a demonstrable reversionary interest is the only logical way to harmonize and give effect to all provisions of § 42–12009, while also honoring the obvious legislative intent to create incentives for the private improvement of public land through preferential tax treatment. The County's interpretation would impose a substantial *disincentive* by placing Taxpayers in the highest possible tax bracket. Taxpayers' proposed interpretation is also consistent with the tenet that courts will liberally construe statutes establishing property tax liabilities in favor of taxpayers.

■ ¶ 19 We hold that § 42–12009 requires the existence of a demonstrable reversionary interest at the time of taxation. The County and the tax court erred by concluding that the statute mandates an inviolable "guarantee" that the Improvements will revert. The record reflects that the county assessor rejected class nine status because the Improvements "do not unequivocally become the property of the [S]tate." Similarly, during oral argument on the motion for summary judgment, counsel for the County posited: "[O]nly in the event that the Court finds that Section 8.9 of the lease is worded *in such a way that it guarantees that the improvements will revert to the State*, only in that event does the Court need to go to an analysis of the error correction statutes...." (Emphasis added.) The tax court, speaking

of the "clairvoyance" required to know whether the Improvements would ultimately revert, and focusing solely on the one Lease provision authorizing destruction of the Improvements, implicitly imposed a guarantee, thereby holding Taxpayers to a more stringent standard than the statute imposes.

¶ 20 Should the legislature deem it appropriate to enact further protections for governmental reversionary interests or clarify its intent regarding class nine eligibility, we presume it will do so. And though it is beyond the scope of this opinion to analyze the legal and equitable claims available to the State should Taxpayers destroy the Improvements, it is clear such potential remedies exist.

¶ 21 The record establishes the existence of a demonstrable governmental reversionary interest. Taxpayers are contractually obligated to "surrender peaceable possession of the Premises" upon Lease termination or expiration and to quitclaim "any right title or interest" to the State. "Premises" includes both the underlying land and the Improvements.[2] The record also supports Taxpayers' contention that they are so circumscribed in their ability to affect the Improvements that it is the *County's* claim that is speculative.

■ ¶ 22 Section 8.9 of the Lease provides:

*Removal.* With the approval of any pertinent Permitted Mortgagee, the Owner of the Improvements shall have the right, from time to time, to remove or demolish all or any part of such Improvements on the Parcel without any obligation to reconstruct Improvements thereon; provided, however, that Lessee shall continue to be obligated to pay the rent as set forth in *Article* 5 (except that Alternative Rent shall thereafter be computed taking into account that such Improvements have been demolished or removed).

Section 8.9 cannot be read in a vacuum. Other contractual provisions substantially limit Taxpayers' ability to affect the Im-

**2.** "Improvements" are broadly defined as "[a]ll buildings, streets, curbs, sewers, drainage and flood control structures, sidewalks, fences, utilities, landscaping, signs and other structures of

every kind and nature which exist, at any time, on, above or below the Parcel or a portion thereof and which cannot be removed without destroying their value."

provements. For example, the Leases state that the Property is to be used as a hotel or "similar resort facility" and as a golf course. Additionally, Taxpayers are required to "keep and maintain the Premises in good order, condition and repair"—a requirement in clear conflict with destruction of the Improvements. The Lease requires Taxpayers to file a sworn statement each year, "setting forth the character of the Improvements and their actual cash value," and the State has the right to inspect the Property for lease compliance. Removal or demolition of "all or any part" of the Improvements requires approval of Taxpayers' mortgagee. If Taxpayers demolish the Improvements, they are nonetheless required to pay rent through the end of the Lease term. Moreover, Arizona law implies a covenant of good faith and fair dealing in every contract. *Bike Fashion Corp. v. Kramer,* 202 Ariz. 420, 423, ¶ 13, 46 P.3d 431, 434 (App.2002). That covenant prevents any party from acting "to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings v. Apodaca,* 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986).

■ ¶ 23 The Lease prohibition against waste is also significant. Waste includes "[a]ny alteration which materially injures the landlord's reversionary interest, or materially changes the nature and character of the demised premises." *Harar Realty Corp. v. Michlin & Hill, Inc.,* 86 A.D.2d 182, 449 N.Y.S.2d 213, 216 (1982).

¶ 24 In *King's Court Racquetball v. Dawkins,* 62 S.W.3d 229, 231 (Tex.Ct.App.2001), a racquetball court lease allowed the lessee to alter the premises "without restriction." The lessee obtained a demolition permit and gutted the building. *Id.* at 232. Citing another lease provision forbidding waste, the court upheld an award of damages to the lessor for costs incurred in restoring the premises. *Id.* at 234–36. The court held that terms allowing the lessee to alter the premises without restriction could not be "plucked from their context," but must be interpreted, if possible, to give effect to the entire agreement and harmonize "potential conflict between differing provisions." *Id.* at 233–34. Construing the words "without restriction" to authorize the demolition and return of property in a useless state would contradict the parties' intent. *Id.* at 234. The right to alter "is not plenary" and at the very least requires the tenant not to destroy, in whole or in part, a building without accompanying repair and reconstruction. *Id.*

■ ¶ 25 *King's Court* is consistent with Arizona law regarding both waste and contract interpretation. Contracts are to be read as a whole, harmonizing terms and reconciling conflicting provisions "by a reasonable interpretation in view of the entire instrument." *Brisco v. Meritplan Ins. Co.,* 132 Ariz. 72, 75, 643 P.2d 1042, 1045 (App.1982); *see also Nichols v. State Farm Fire & Cas. Co.,* 175 Ariz. 354, 356, 857 P.2d 406, 408 (App.1993) (holding that a contract must be "read as a whole in order to give a reasonable and harmonious meaning and effect to all of its provisions" (citation omitted)). As in *King's Court,* the Lease term prohibiting waste "serves to protect the landowner's reversionary interest in the property." 62 S.W.3d at 233.

¶ 26 Additionally, the Property is subject to the 1990 Desert Ridge Specific Plan (the "Plan"), which controls development in the Desert Ridge community. The Plan creates a Design Review Committee ("DRC"), which is responsible for ensuring adherence to the community's Declaration of Covenants, Conditions and Restrictions" ("CC & Rs"). Section 5.3 of the CC & Rs requires the DRC to approve changes, modifications, alterations, and remodeling of the exterior of improvements on the Property. The Leases require Taxpayers to treat the Improvements "consistent with the ... Plan." Likewise, the Leases are "expressly made subordinate to the Master CC & Rs."[3]

¶ 27 Finally, Taxpayers are constrained by state law. *See Qwest Corp. v. City of Chandler,* 222 Ariz. 474, 484, ¶ 34, 217 P.3d 424,

---

3. In dealing with the Improvements, Taxpayers are further constrained by their management agreement with Marriott and the terms of their leasehold mortgage. We give little weight to these limitations, though, which presumably neither the County nor State would have standing to enforce and which could be amended without governmental input.

434 (App.2009) ("[A]ll contracts incorporate applicable statutes and common-law principles."). Arizona Revised Statutes § 37–281(D) (2003) prohibits lessees of State land from using the premises "except for the purpose for which the lands are leased." The property at issue is leased for resort and golf course usage. Additionally, A.R.S. § 37–322.03(A) (2003) requires written authorization from the SLD before a lessee may remove any improvement. The statute reads, in pertinent part:

A lessee of state land shall maintain all improvements that are pertinent to the lease in serviceable condition for the term of the lease and shall not remove any improvement without written authorization from the department.... All improvements placed upon state land shall, until they become the property of the state, be subject to assessment for taxes in the name of the owner, as other property.

A.R.S. § 37–322.03(A).

¶ 28 According to the County, the Leases constitute the SLD's written authority to destroy the Improvements. Reading the Leases as a whole, we disagree. We further note that the State is not a party to these proceedings and has made no such concession. At oral argument, Taxpayers maintained that the Lease did not trump Arizona law and conceded that SLD approval would be required. But even assuming the requirements of § 37–322.03 have been effectively waived, Taxpayers' theoretical ability to destroy the Improvements is so circumscribed that, as a matter of law, it does not vitiate the State's reversionary interest.

¶ 29 We disagree with the tax court that section 8.7, Article 23, or Article 24 of the Lease somehow defeat class nine eligibility. These provisions prescribe rights and obligations the State has upon Lease termination or if the State sells its ownership interest during the pendency of the Lease. Taxpay-

ers are entitled to specified levels of reimbursement for the Improvements from a new owner or lessee under certain circumstances.[4] But under all of the enumerated scenarios, the State will have either received its reversionary interest in the Improvements or made the independent decision to sell its interest in the Property. The possibility of third party payments to Taxpayers does not affect the State's reversionary interest.

### III.  *Taxpayers' Recourse*

■ ¶ 30 The County alternatively argues that Taxpayers may not seek relief under the error correction statute and that their classification challenge is untimely.[5] We disagree with both contentions.

¶ 31 Arizona Revised Statutes § 42–16251(3)(b) (Supp.2010) states:

(3) "Error" means any mistake in assessing or collecting property taxes resulting from:

. . . .

(b) An incorrect designation or description of the use of property *or its classification* pursuant to chapter 12, article 1 of this title.

(Emphasis added.) Taxpayers' classification challenge falls squarely within the statutory definition of "error."

■ ¶ 32 Taxpayers' action is also timely. In *Pima County Assessor v. Arizona State Board of Equalization*, this Court considered a classification challenge under the error correction statutes that had not been presented previously to the Board of Equalization, though other issues relating to the same tax year had been litigated in that forum. 195 Ariz. 329, 333–34, ¶¶ 12–14, 987 P.2d 815, 819–20 (App.1999). The court noted the legislature's intent to "permit any tribunal properly presented with an error-correction claim to remedy property tax 'errors' when appro-

4. For example, a new owner of the Property would owe Taxpayers ten percent of the appraised value of the Improvements. A new lessee would owe Taxpayers the full value.

5. In an earlier appeal to the Arizona State Board of Equalization, Taxpayers challenged the assessor's valuation of the Improvements, but not

their classification. After receiving an adverse ruling, Taxpayers appealed to the tax court, initially challenging both the valuation and the classification of the Improvements. In an amended complaint filed by stipulation of the parties, Taxpayers dropped the valuation issue and proceeded only on their classification challenge.

priate to do so in the interest of justice." *Id.* at 334, ¶ 14, 987 P.2d at 820. We emphasized the broad remedial purpose of the error correction statutes and refused to engraft time restrictions on the classification challenge beyond those limitations already in place. *Id.* at 336, ¶¶ 25–26, 987 P.2d at 822; *see, e.g.,* A.R.S. § 42–16256(B) (2006) ("[A] notice of error or notice of claim under this article is limited to the current tax year in which the notice of error or notice of claim is filed and the three immediately preceding tax years."). The court discussed the potential for "claim-splitting or other taxpayer abuses," stating:

> We accordingly infer two principles in the error-correction scheme. First, if the taxpayer knew of or reasonably should have discovered an "error" within A.R.S. section 42–16251(3) in sufficient time to assert it through a tax appeal, then sections 42–16251 to –16259 cannot later provide a remedy. Second, if the "error" has escaped the taxpayer's attention despite the exercise of reasonable care to discover it in time, sections 42–16251 to –16259 can provide a remedy regardless of whether the taxpayer prosecuted a tax appeal for the tax year in question.

*Pima County Assessor,* 195 Ariz. at 336, ¶¶ 25, 26, 987 P.2d at 822.

¶ 33 In the case at bar, Taxpayers are not claiming refunds for tax years preceding 2003. Nothing in the record establishes that Taxpayers knew or should have known of the classification error here or failed to exercise reasonable care. Under these circumstances, their challenge is proper under the error correction statutes.

### IV. *Primary Use Adjudication*

■ ¶ 34 The County also contends the tax court erred by determining that the Property is used primarily for athletic, recreational, entertainment, artistic, cultural, or convention activities, within the meaning of § 42–12009(A)(1)(b). It asks us to strike the tax court's "primary use determination." We decline to do so.

6. Thus, the County properly raises, as a cross-issue, its arguments regarding the error correction statutes. Prevailing on this issue would not

¶ 35 Neither party sought summary judgment or a pretrial adjudication regarding primary use. In opposing the County's motion for summary judgment, however, Taxpayers submitted an expert's report that discussed the Property's primary use as a convention facility, which the County did not substantively controvert. The tax court's minute entry ruling (which was later incorporated into the judgment) includes an express finding that Taxpayers "do meet" the specified purposes requirement of § 42–12009. The tax court reaffirmed this finding when it entered judgment, rejecting a proposed form of judgment lodged by the County that omitted the primary use determination.

¶ 36 There was evidence in the record from which the tax court could conclude that the Property is used primarily for convention purposes. *Cf. Century Med. Plaza v. Goldstein,* 122 Ariz. 583, 585, 596 P.2d 721, 723 (App.1979) (holding that a trial court may enter summary judgment for a non-moving party under appropriate circumstances). But even assuming *arguendo* that the court erred in making the primary use determination, the County was required to file a cross-appeal to obtain relief from that ruling.

■ ¶ 37 Rule 13(b)(3) of the Arizona Rules of Civil Appellate Procedure states: "The brief of the appellee may, without need for a cross-appeal, include in the statement of issues presented for review and in the argument any issue properly presented in the superior court." The appellate court, however, "may direct that the judgment be modified to enlarge the rights of the appellee or to lessen the rights of the appellant only if the appellee has cross-appealed seeking such relief." *Id.* In other words, absent a cross-appeal, we "may not alter the lower court's judgment in a manner favorable to the appellee." Ariz. R. Civ.App. P. 13, State Bar Comm. Note. The Note explains that "[e]ssentially no issues which could lead to the same practical result as that embodied in the judgment will be foreclosed by lack of a cross-appeal."[6] *Id.; see also State v. Daw-*

enlarge the County's rights under the judgment or lessen Taxpayers' rights.

*son,* 164 Ariz. 278, 282, 792 P.2d 741, 745 (1990) (rejecting a claim that, absent an appeal or cross-appeal, the court is "statutorily conferred with the power to consider any error raised by the state that is not in *support* of the judgment"); *Town of Miami v. City of Globe,* 195 Ariz. 176, 177 n. 1, 985 P.2d 1035, 1036 n. 1 (App.1998) (noting that, as a *cross-issue,* an appellee may seek to uphold a judgment for reasons different from those cited by the trial court).

¶ 38 Striking the tax court's primary use finding would leave the last requirement of § 42–12009 unresolved and would necessitate a remand. Requiring Taxpayers to return to the tax court to litigate the primary use of the Property would create a burden, lessen their rights, and enlarge the County's rights. Accordingly, the County was required to file a cross-appeal in order to challenge the tax court's primary use determination.[7]

### V. *Summary Judgment for Taxpayers*

■ ¶ 39 Taxpayers ask us to remand to the tax court, with instructions to enter summary judgment in their favor. "[W]here the issues can be decided as a matter of law, we have the authority both to vacate the trial court's grant of summary judgment in favor of one party and to enter summary judgment for the other party if appropriate." *Anderson v. Country Life Ins. Co.,* 180 Ariz. 625, 628, 886 P.2d 1381, 1384 (App.1994). Because there are no genuine issues of material fact, and Taxpayers are entitled to class

nine classification as a matter of law, we reverse summary judgment in favor of the County and remand with instructions to enter summary judgment in Taxpayers' favor.

### VI. *Attorneys' Fees*

■ ¶ 40 Taxpayers request attorneys' fees and expenses pursuant to A.R.S. § 12–348(B)(1) (2003). Under § 12–348(B)(1), courts may award fees and expenses when taxpayers successfully challenge the imposition of taxes. As the successful parties on appeal, Taxpayers are awarded their reasonable attorneys' fees and expenses upon compliance with Arizona Rule of Civil Appellate Procedure 21 and A.R.S. § 12–348(E)(3), (5).

### CONCLUSION

¶ 41 We reverse the grant of summary judgment to the County and remand to the tax court, with instructions to enter summary judgment in Taxpayers' favor.

CONCURRING: MAURICE PORTLEY, Presiding Judge, and PATRICIA A. OROZCO, Judge.

---

**7.** This case is distinguishable from *Nielson v. Patterson,* 204 Ariz. 530, 65 P.3d 911 (2003), where no cross-appeal was required because the superior court had entered an order entirely in appellees' favor. *Id.* at 532–33, ¶ 10, 65 P.3d at 913–14. Here, the primary use determination favors Taxpayers.